## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN C. COLEMAN,<br><br>      PLAINTIFF,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE,<br><br>      DEFENDANT. | Case No. 1:22-cv-717 |

## COMPLAINT WITH JURY DEMAND

Plaintiff John C. Coleman, M.D. is a trained psychiatrist and officer in the United States Army with decorated combat experience. In 2012, Plaintiff served as a squadron surgeon in Afghanistan. Multiple improvised explosive devices (IEDs) struck Plaintiff while he was on patrol, injuring his neck and spine. As is common for trauma to the cervical spine, these injuries have insidiously progressed and worsened with time and repeated use. Plaintiff's present-day disabilities resulting from this trauma cause him significant pain, unpredictable spasms, and tingling and numbness that radiates from his neck into his hands, all of which limit his motor skills and ability to reasonably perform common military tasks and tasks required of service members of his military grade, rank, and rating. Because of these conditions, Plaintiff is no longer medically fit to continue in active-duty service. His doctors, physical therapists, and commanding officers agree. The Army agreed too. After reviewing Plaintiff's medical records last year, the Army's Physical Evaluation Board or "PEB" (the sole body responsible for determining whether a service member is medically fit or unfit for continued service) correctly concluded that Plaintiff was

1

medically unfit for active-duty military service and eligible for retirement benefits.  That should have been the end of it.  Plaintiff seeks relief from this Court because of what happened next.

Three weeks after the Army (correctly) found Plaintiff unfit for duty due to his combat-related disabilities and recommended medical retirement benefits, there was an inexplicable about-face in the Army's position.  The agency that sits above the PEB, called the Physical Disability Agency or "PDA," unlawfully sought its own evidence from a consultant within the United States Army Office of the Surgeon General and used it to issue a rebuttal to the PEB's earlier findings.  Not only was this intervention unwarranted and improper in scope and purpose, the PDA's rebuttal was remarkably based on a one-line email penned by an individual with a *stated* conflict of interest and without any orthopedic credentials.

After this interjection from its higher-ups, the PEB reversed its earlier (correct) finding and issued a revised finding—based on the PDA's rebuttal—that concluded Plaintiff was fit for duty.  No new medical evidence was considered in the PDA rebuttal or the PEB's subsequent reversal.  And there is no indication that Plaintiff's medical record was considered, much less examined, by the United States Army Office of the Surgeon General individual whose opinion was the basis for the reversing and blocking Plaintiff's access to the medical retirement and benefits to which he is legally entitled because of his combat-related disabilities.  Moreover, the intervention from higher up in the Army affected Plaintiff's ability to receive a full and fair hearing on the merits upon appeal.

Accordingly, Plaintiff brings this action against the United States Department of Defense. Plaintiff seeks relief under the Administrative Procedure Act from the Army's erroneous—and procedurally deficient—decision that Plaintiff is fit for duty, despite his combat-related bilateral radiculopathy and cervical spondylosis.  The Army's decision to revoke and deny Plaintiff

disability benefits was arbitrary, capricious, and contrary to law because (1) the Army failed to apply the standards of fitness required by Department of Defense Instruction ("DoDI") 1332.18, which governs when a service member is unfit for duty due to disability; and (2) the Army's decision to overturn its previous conclusion that correctly found Plaintiff unfit for duty resulted from a violation of Army regulation, namely improper interference by the PDA and reliance on an unsupported opinion by an individual with a stated conflict at the United States Army Office of the Surgeon General.

## NATURE OF THE ACTION

1.      This is an action under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., for medical retirement benefits owed to Plaintiff due to his combat-related injuries, which render him unfit for active-duty service and eligible for medical retirement benefits.  Plaintiff also seeks relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

## THE PARTIES

2.      Plaintiff has honorably served in the United States Army since 2003.  Plaintiff is a citizen of the United States and is currently stationed in Fort Bliss, Texas.

3.      Defendant United States Department of Defense, headquartered at 1400 Defense Pentagon, Washington, D.C. 20301-1440, is a department of the Executive Branch of the United States Government and an agency of the United States as defined by the APA (5 U.S.C. § 701(b)(1)) and 28 U.S.C. § 1391(e)(1).  The Army Physical Disability Agency (PDA) and Army Physical Evaluation Board (PEB) are organizations within the Department of Defense.

## JURISDICTION

4.      The Court has federal-question jurisdiction under 28 U.S.C. §1331 because this civil action arises under the APA and laws governing the military.

5.      An Army PEB evaluated Plaintiff and his entitlement to medical retirement and associated benefits.

6.      Plaintiff has exhausted his administrative remediates prior to commencing this action.  After the Army reversed its finding of unfitness, Plaintiff appealed.  Plaintiff has appealed the Army's administrative decisions at each level of review, culminating in the PDA's decision to uphold the PEB's finding that Plaintiff is fit for active duty on January 25, 2022.

7.      Plaintiff seeks declaratory and other equitable relief, in particular, that this Court hold unlawful and set aside the Army's erroneous determinations regarding Plaintiff's fitness under DoDI 1332.18 and remand Plaintiff's case to the Army for resolution in accordance with law. *See* 5 U.S.C. § 702.

## FACTUAL BACKGROUND

**A.      Plaintiff's Service and Combat Injuries**

8.      Plaintiff has honorably served in the United States military for nearly two decades. First, in the Navy as a Petty Officer 2nd Class, on active duty for over five years from 1988 to 1993. Then, in the Army, to which he commissioned as a second lieutenant in 2003 when he began medical school at the Uniformed Services University of Health Sciences (USUHS).

9.      After graduating from USUHS with a medical degree, Plaintiff completed a general surgery residency at William Beaumont Army Medical Center and then served as a battalion surgeon (staff physician) at Tripler Army Medical Center in Hawaii.

10.      In 2012, Plaintiff deployed to Afghanistan as a squadron surgeon with the 4th Brigade Combat Team, 82nd Airborne Division.  During that deployment, Plaintiff conducted numerous dismounted combat patrols during which he was subject to enemy fire.  On one such patrol Plaintiff was injured by concussive blasts from multiple IEDs.  As a result, Plaintiff suffered

4

significant head and neck trauma that caused peripheral nerve damage and permanent injury to his cervical spine.

11.     After the deployment in Afghanistan, Plaintiff was deployed to Camp Casey near the North Korea-South Korea border. Plaintiff has received medals for his deployments.

12.      In 2014, motivated by a passion for serving and advocating for his fellow soldiers, he began his training in psychiatry.  Plaintiff completed his residency in general psychiatry with the Army in 2014 and a fellowship in addiction psychiatry in 2018.

13.     Since the initial injury in 2012, Plaintiff's combat-related neck and cervical spine injuries have worsened, resulting in significant duty-limiting pain as well as numbness and tingling in Plaintiff's neck and spine that radiates through his upper extremities.  Plaintiff has been diagnosed with cervical spondylosis, intervertebral disc syndrome, degenerative arthritis of the spine and bilateral upper extremity radiculopathy.  *See, e.g.,* Ex. 1 (NARSUM).   MRIs of Plaintiff's cervical spine have shown multilevel cervical degenerative changes and paracentral disc herniation at C6-C7 that indents the ventral aspect of the spinal cord and contracts the C7 nerve root, the likely cause of Plaintiff's upper extremity radiculopathy.  *Id.*

14.      In combination, these conditions prevent Plaintiff from being able to perform basic, requisite military and functional tasks, such as performing field duty, wearing protective gear, carrying gear, and driving.  Even if Plaintiff *could* do these things he cannot *reasonably* do them without exacerbating his injuries.  For example, Plaintiff cannot wear an Army Combat Helmet ("ACH")[1] or other protective body armor because doing so would put pressure on his neck and exacerbate his neck and spine injuries.  *See, e.g.,* Ex. 2 (Nov. 2021 Commander Statement). Nor can plaintiff fire a weapon or ride in military vehicles because such activities exacerbate his

---

[1] Service members are required to wear an ACH when traveling in military transit.

injuries and his pain. *Id.* Additionally, Plaintiff has bilateral incomplete paralysis in his median and ulnar nerves[2] that affects his fine motor skills, making it difficult for him to perform even basic tasks that require use of hands. Such activities include typing, writing, using tools, and even lacing his boots and buttoning a shirt to dress. *See, e.g.,* Ex. 3, Section X (VA Exam Peripheral Nerve Conditions); Ex. 2, Section III(A)(1)(D) (Nov. 2021 Commander Statement) (noting that Plaintiff's condition "limits all duties (even typing)").

**B.      Standards for Medical Retirement and Plaintiff's Evaluation by the Army**

**1.      Overview of the Army Physical Disability Evaluation System**

15.      Title 10, Chapter 61 of the United States Code establishes the process through which the Army discharges disabled soldiers. It authorizes the Secretary of the Army to retire disabled service members upon a determination that due to physical or mental disability (or disabilities), the member is unfit to perform the duties of his or her office, grade, rank, or rating. 10 U.S.C. § 1201(a).

16.      The Department of Defense has implemented these statutory requirements through DoDI 1332.18 and United States Department of Defense Manual ("DoDM") 1332.18, which establish the Integrated Disability Evaluation System ("the IDES") and prescribe the overarching standards and procedures for conducting disability evaluations. The Army, in turn, has issued its own regulations describing the procedures used to evaluate and adjudicate disability cases. *See* Department of the Army Regulation 635-40, Disability Evaluation for Retention, Separation or Retirement.

---

[2] The median and ulnar nerves are nerves that exit the cervical spine, extend down the arms, enable the control of the detailed movements of the hand, and affect sensory function.

17.     A service member cannot self-refer into the IDES.  A medical provider refers service members to the IDES when the medical provider diagnoses a medical condition that appears to fall below military retention standards, as with Plaintiff's neck and spine injuries.

18.     The IDES process begins with a series of medical examinations conducted by the Department of Veterans Affairs ("VA").  These exams assist the military's fitness determination and  allow VA to assign a rating determination for each medical condition.[3]  *See* DoDI 1332.18, Encl. 3, ¶ 1(c) (Aug. 5, 2014).

19.     After a service member has his or her VA evaluation, a medical evaluation board (called an "MEB") that is comprised of two or more physicians convenes to evaluate and document the service member's disabilities for the purpose of deciding whether to refer the soldier's case to the PEB.  DoDI 1332.18, Encl. 3, ¶¶  2(b), 2(f)(2).   If the medical evaluation board finds that a service member has one or more conditions that fail Army retention standards and prevent the service member from performing the duties of his or her office, grade, rank or rating, it will refer the case to the PEB.  DoDI 1332.18, Encl. 3, ¶ 2(d).

20.     The PEB is responsible for determining whether a service member with a disability is fit for continued military service, and determining benefit eligibility for unfitting conditions.  DoDI 1332.18, Encl. 3, ¶ 3(a).  There are two types of PEBs that a service member may encounter in the PEB portion of the IDES process: an informal PEB and a formal PEB.  *See* DoDI 1332.18, ¶ 3(a).

21.     A service member's case first goes to the informal PEB.  The informal PEB is comprised of at least two military personnel at field grade or civilian equivalent or higher than the

---

[3] VA ratings are assigned as a percent value on a scale from 0 percent to 100 percent based on the severity of a service member's condition.

evaluated service member and makes initial fitness findings without the service member present. *Id*. ¶¶ 3(b), 3(d)(1).  A formal PEB assembles only when a service member requests a formal PEB hearing.  Therefore, if the service member accepts the findings of the informal PEB and does not request a formal hearing, the informal PEB's conclusion will be binding.

22.     Under Department of Defense regulations, the Army must consider a service member "unfit" for duty if, due to injury, that service member meets *any* one of the following criteria:  (i) the service member cannot reasonably perform the duties of his office, grade, rank, or rating;  (ii) the service member represents a medical risk to himself or to the welfare or safety of others;  *or*,  (iii) the service member imposes unreasonable requirements on the military to protect him.  DoDI 1332.18, App. 2 to Encl. 3, ¶ 2.

23.     During its review, the PEB assigns each unfitting condition a disability rating from 0 percent to 100 percent, in increments of 10 percent.  Generally, when assigning a rating, the PEB, "shall, to the extent feasible, utilize the schedule for rating disabilities in use by the Department of Veterans Affairs," and, unless it would result in a greater percentage of disability, "may not deviate from the schedule". 10 U.S.C. § 1216a(a).

24.     The disability ratings the PEB assigns to a service member's unfitting conditions determine the benefits a service member receives upon separation.  A combined disability rating of 30% or more entitles a service member to medical retirement based on their disability, as well as monthly disability retirement pay and other medical benefits.  *See* 10 U.S.C. § 1201.  Whereas a combined disability rating below 30 percent still entitles the service member to a medical separation, but with only a one-time lump-sum severance payment and no additional benefits.  10 U.S.C. § 1203.

25.    As discussed above, if the service member disagrees with the findings of the informal PEB, he or she can rebut the findings and request a personal appearance before a formal PEB.  A hearing before the formal PEB is authorized by 10 U.S.C. § 1214, which provides that "[n]o member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it." *Id*.

26.    Following a formal PEB hearing, a service member may accept the formal PEB decision or non-concur with a formal PEB decision by filing a statement of appeal to the Physical Disability Agency.  *See* AR 635-40, ¶ 4–22(g).  Even where a service member does not elect to appeal to the PDA, his or her case may still be subject to a mandatory or quality assurance review by the PDA.  *See* AR 635-40, ¶ 4–25(a), (b).[4]

27.    Army Regulations set forth the scope and purpose of all PDA reviews.  *See* AR 635-40, 4–25(c).  Regulation permits the PDA to review the "medical file or documentation, and related evidence received from the PEB" to ensure that: (1) the service member received of a full and fair hearing; (2) the MEB and PEB were conducted under regulations; (3) findings were just, equitable, and supported by substantial fact; (4) due consideration was given to the facts and requests contained in rebuttal to the PEB findings; (5) records of the case are accurate and complete.  *Id*.

### 2.    Overview of Plaintiff's IDES Evaluation by the Army

28.    In July 2020, Plaintiff's physician referred him to the IDES process for his cervical spondylosis, degenerative arthritis, and bilateral upper extremity radiculopathy.

---

[4] Sometimes a PDA review is mandatory, such as when a soldier does not concur with either the informal or formal PEB,  when a soldier was previously assigned to the PEB or PDA, when a case previously went to the PDA and was returned to the PEB for reconsideration, when there is a minority report at the last level of PEB adjudication, and cases where general and medical corps officers are found unfit.  *See* AR 635-40, ¶ 4–25(a).

29.     At the time Plaintiff attended his scheduled VA medical exams, the VA assigned a combined 100 percent disability rating to Plaintiff's conditions. Ex. 4 (Excerpts from VA Ratings).[5]  To Plaintiff's neck and spine conditions, the VA assigned a 20 percent evaluation for cervical spine pain due to cervical spine degenerative arthritis and cervical spine intervertebral disc syndrome, 20 percent evaluation for left upper extremity cervical radiculopathy, 20 percent evaluation for right upper extremity cervical radiculopathy, and 10 percent evaluation for lumbar spine cervical spondylosis and degenerative arthritis. *Id.* at 10-13.

30.     Additionally, when Plaintiff was referred to the IDES process, Plaintiff's commander submitted an official statement that concluded Plaintiff's "medical condition(s) may have negative [e]ffects on the performance of [Plaintiff's] duties." Ex. 5, section III(A)(4) (July 2020 Commander Statement).  In that statement,  Plaintiff's commander also reported that Plaintiff's duty schedule had been modified due to his condition that caused significant pain throughout his neck and radiating into his arms limiting all duties, even typing.  Since July 2020, Plaintiff has received two additional formal commanders' statements which recommended that Plaintiff "be found unfit for duty and separated from the military." Ex. 6, section III(C)(Feb. 2021 Commander Statement); Ex. 2, section III(C) (Nov. 2021 Commander Statement).

31.     In March 2021, a MEB convened and determined that Plaintiff's cervical spondylosis and bilateral upper extremity radiculopathy failed retention standards. Ex. 1, section 7 (NARSUM).  Accordingly, the MEB then referred Plaintiff to the PEB.  *See* DoDI 1332.18, Encl. 3, ¶ 2(d).

---

[5] Note the PEB did not consider all of the conditions for which the VA assigned ratings, nor did Plaintiff request them to be considered.

32.     In May 2021, the informal PEB found Plaintiff to be unfit for duty and recommended a combined rating of 80 percent, entitling Plaintiff to permanent disability retirement.  The 80 percent rating was the product of the PEB assigning a 20 percent rating for Plaintiff's cervical spondylosis, 20 percent rating for left upper extremity radiculopathy, 20 percent rating for right upper extremity radiculopathy, and 50 percent rating for bilateral pes planus and plantar fasciitis. *See*  Ex. 7 at 2-3 (IPEB Unfit Finding).

33.     Although Plaintiff agreed with the conclusion, before officially accepting the findings he requested an amendment to description of the onset of his cervical conditions to accurately reflect his medical history.  On July 16, 2021, the PEB issued another finding, similarly finding that Plaintiff was unfit for duty.  Ex. 8 (Revised IPEB Unfit Finding July 2021). Plaintiff accepted this finding.  *Id.*

34.     On August 6, 2021—after Plaintiff had been found unfit *twice* by the PEB— Plaintiff received notice that the PEB reversed its findings due to a rebuttal opinion by the PDA.[6] The PDA's rebuttal was based on a one-line email, sought by the PDA, from a psychiatry consultant at the United States Army Office of the Surgeon General ("OTSG").  The email from the OTSG psychiatry consultant opined:

> Team,
>
> The Officer is able to serve as a psychiatrist.
>
> VR
>
> █████

---

[6] Both the PDA and the United States Army Office of the Surgeon General are above the PEB in the Army's hierarchy of medical review.

Ex. 9 at 1 (OTSG Opine Email).[7]

35.     That single-sentence email, cited by the PDA as the "OTSG Opine," upended pages of medical documentation, hours of medical review, and months of work in the IDES process. Based on that opinion, the PDA declared that Plaintiff's "referred conditions do not appear to prevent him from performing his duties as a psychiatrist" and concluded that, as such, Plaintiff "is fit to continue to serve as an Army Psychiatrist (60W)." Ex. 10 (PDA Rebuttal to PEB Finding).

36.     Relying on the rebuttal from its higher-ups at the PDA, the PEB reversed and issued a revised fit finding—despite having just given a combined disability rating of 80 percent based on its reasoned review and analysis of Plaintiff's medical record and commander support.

37.     Upon receiving notice that he was no longer to be medically retired and no longer eligible for retirement and disability benefits for his combat-related disabilities, Plaintiff appealed and requested a formal PEB hearing.  The formal PEB hearing was held on December 15, 2021. Plaintiff submitted exhibits, gave sworn live testimony, and made himself available for questions from the formal PEB members.

38.     The formal PEB, both in its hearing and its subsequent report, echoed the PDA's rebuttal and deemed Plaintiff fit for duty.  Ex. 11 (Formal PEB Report).  Unsurprisingly given that their superiors at the PDA had already dictated the preferred outcome in Plaintiff's case, the formal PEB failed to engage with Plaintiff's medical evidence or evidence about his inability to reasonably perform duties fitting of his office.  Although Army Regulations require that the formal PEB's "[f]indings will be made (and cited in the record of proceedings) on the basis of objective evidence in the record as distinguished from personal opinion, speculation, or conjecture", the

---

[7] "VR" presumably means "very respectfully."  The name of the consultant has been omitted from this screens capture of the OTSG Opine Email. *See* Ex. 9 at 1.

formal PEB failed to cite apposite legal bases or to cite objective evidence to support its conclusion.[8]  AR 635-40, 5–6a.

39.    Rather than applying the proper standard—which requires a soldier to be fit for active duty military service, including the ability to be a deployable asset and to reasonably perform tasks appropriate to their grade, rank, and rating—the formal PEB instead fixated on Plaintiff's ability to practice medicine in *some* settings and perform *some* subset of military tasks.[9] In other words, the formal PEB incorrectly focused on Plaintiff's ability to perform as a psychiatrist, not—as required—his ability to perform as a soldier.

40.    Crucially, the fact that Plaintiff is a medical officer does *not* exempt him from the requirement that he be fit to perform basic soldiering duties.  Army Regulation 63540, 5-4 states that, in determination of a soldier's fitness, "As a minimum standard, the functional tasks listed on DA Form 3349 will be considered common military tasks required of all Soldiers."  These functional tasks include: wearing a helmet, body armor, and load bearing equipment; riding in a military vehicle wearing protective gear; and moving 40 pounds while wearing usual protective gear.  *See, e.g.,* Ex. 6, Section III(A)(1)(G) (Feb. 2021 Commander Statement) (noting that due to his medical conditions, Plaintiff cannot complete "basic soldiering duties"); Ex. 12 (Army Directive 2018-22 §§ 2, 4(a)) (proscribing, "we must have a deployable and fit culture in the

---

[8] For example, the formal PEB relied on DoDI 1332.18, Appendix 2, Enclosure 3, ¶ 4(b), "[a]n officer in pay grade O-7 or higher, or a medical officer in any grade, being processed for retirement by reason of age or length of service, will not be determined unfit unless the determination of the Secretary of the Military Department concerned with respect to unfitness is approved by the USD(P&R) on the recommendation of the ASD(HA)."  This is inapplicable; Plaintiff is not being processed for retirement by reason of age or length of service.

[9] *See, e.g.,* Ex. 11 at Section VII (Formal PEB Report) ("Although he is currently not performing his medically specialized duties, …the Officer is capable of performing his current duties … and is capable of providing cogent medical opinions, providing guidance, preparing documents, and/or effectively collaborating with colleagues and peers.").

Army" and that being deployable includes, *inter alia*, ability to "carry and employ an assigned weapon" and "operate while wearing body armor, helmet, eye protection, gloves, and/or chemical and biological protective equipment.").

41.    As a last recourse within the Army's administrative system, Plaintiff appealed directly to the PDA.  Plaintiff submitted detailed arguments that relied on medical and legal evidence to support his appeal.  But the PDA refused to reconsider.

42.    The Army's revocation of Plaintiff's retirement and disability benefits and its refusal to further engage with the record following the "OTSG Opine" was arbitrary and capricious, unsupported by substantial evidence, and contrary to law.  Therefore, Plaintiff appeals to this Court for review of his administrative record.

**C.    Plaintiff's Disabilities Render Him Unfit for Continued Active-Duty Service Under the Standards for Medical Retirement**

43.    Under the applicable standards set out in 10 U.S.C. § 1201 and DoDI 1332.18, the Army must find a soldier unfit for duty if he or she meets any one of the following criteria: (a) the soldier, due to a disability, is unable to reasonably perform duties of his or her office, grade, rank, or rating; (b) the soldier's disability represents a decided medical risk to the health of the soldier or to the welfare or safety of other members, or (c) the soldier's disability imposes unreasonable requirements on the military to maintain or protect the soldier.  Each factor provides an independent basis for the Army to find a service member unfit.  The preponderance of the evidence supports finding Plaintiff physically unfit under *all three* factors.

44.    Importantly, there are no special standards or exceptions for active-duty physicians. Despite the value of skilled psychiatrists to the service given the mental health crisis the military faces, Army physicians are still soldiers, required to be able to perform basic military tasks and be evaluated as such during the IDES process.  The standards for fitness must be "consistently and

equitably applied . . . to all Service members, and be uniform within the components of the Military

Departments." DoDI 1332.18, ¶ 3(c).  This is because medical officers need to be able to perform

common military tasks in order to participate in field exercises and to train and travel on stateside

medical missions, such as current COVID-19 hospital support missions within the United States.

Moreover, Plaintiff's commanders—familiar with Plaintiff's abilities and his required duties—

have thrice concluded that Plaintiff's conditions prevent him from serving in his primary mission

of service (MOS) as a 60W Army Psychiatrist[10] in current and future assignments.

> **1.    Plaintiff Is Unable To Reasonably Perform Duties Of His Office, Grade, Rank, Or Rating**

45.    Due to his disabilities, Plaintiff is unable to reasonably perform duties of his office,

grade, rank, or rating.  That fact alone renders Plaintiff unfit to be an active-duty service member.

46.    Under DoDI 1332.18,  a soldier may be unable to reasonably perform the duties of

their office, grade, rank, or rating when they cannot perform common military tasks, take and pass

the regular fitness test, deploy, or perform specialized duties.  *See* DoDI 1332.18, App. 2 to Encl.

3, ¶ 4.  As supported by medical documentation and previous testimony from Plaintiff, his

commanders, and medical providers, Plaintiff's neck and bilateral upper extremity conditions

preclude him from doing any of those things.

47.    Plaintiff's physical profile, his records from independent medical providers, and

commanders' statements unequivocally indicate that his neck and upper extremity conditions

---

[10] As an Army Psychiatrist, Plaintiff's MOS classification is 60W. An 60W "Treat[s] personnel suffering from emotional or mental illness. Examines, diagnoses, and treats or prescribes course of treatment for personnel suffering from emotional or mental illness, mental retardation or situational maladjustment. Examines, diagnoses, and treats or prescribes course of treatment for personnel suffering from emotional or mental illness, mental retardation or situational maladjustment. Examines, diagnoses, and treats or prescribes course of treatment for personnel suffering from emotional or mental illness, mental retardation or situational maladjustment." 60W MOS, http://www.mosdb.com/army/60W/mos/3394/ (last visited Mar. 11, 2022).

prevent him from performing nearly all common military tasks, including but not limited to riding in military planes and vehicles, carrying equipment, sustained activity, and wearing protective gear.  In addition, Plaintiff is also medically prohibited from deploying[11] or  from taking the Army's required physical fitness test.[12]

### 2.    Continuing Active-duty Service is a Decided Risk to Welfare of Plaintiff, Other Service Members and Places a Burden on the Army

48.    As a threshold matter, because Plaintiff can be (and was) found unable to reasonably perform the duties of his office, rank, or rating, the law requires no further analysis to find Plaintiff unfit and to recommend medical disability retirement.  However, even if the PEB chose to find Plaintiff fit under the first independent factor of DoDI 1332.18, Plaintiff is unfit under the second and the third—and thus eligible for medical retirement.

49.    A service member is unfit under the second factor of DoDI 1332.18 if the service member's disability represents a decided medical risk to the service member's health or welfare or the safety of the other service members.  Plaintiff's orthopedic spine surgeon and primary care physician have both stated that many tasks risk further exacerbating Plaintiff's neck injuries and increasing his pain.  *See, e.g.,* Ex. 1 (NARSUM).  Plaintiff's physicians have also posited that his neck injuries may be worsening Plaintiff's other medical conditions.  *See*, *e.g.,* Ex. 14 at 1 (Emergency Report Notes). Plaintiff's physical therapist has also noted that while he can work

---

[11] Here "deployment" refers to any activity in which military personnel and materials are moved from their home station (garrison) to a specified destination. While service members typically deploy overseas, domestic deployments are normal, particularly in response to natural disaster relief efforts. Under all definitions, Plaintiff is not deployable.

[12] In three separate official statements, Plaintiff's commanders conclude that "Surgeons and primary care physician have stated neck pathology in addition to pathology and chronic pain in bilateral ankles, bilateral knees, and right shoulder prevent completing an Army Combat Fitness Test (ACFT)."  Ex. 5 (July 2020 Commander Statement); Ex. 6 (Feb. 2021 Commander Statement); Ex. 2 (Nov. 2021 Commander Statement).

with modifications, these modifications are not compatible with the demands of his Army position. Ex. 13 (Letter from Physical Therapist). Even though Plaintiff's battle-tested resolve enables him to push past the pain some days in order to serve, doing so is to his detriment; turning a blind eye to this fact is precarious and risks the welfare of Plaintiff and others.

50. Plaintiff's unpredictable flare-ups and spasms cause him debilitating pain (so much as to drive Plaintiff to seek emergency medical care) and can put others at risk as well. *See, e.g.,* Ex. 14 (Emergency Report Notes). Simply put, when Plaintiff is in intense pain, his ability to respond to and treat patients with acute psychiatric problems is impaired.

51. Additionally, and as noted by Plaintiff's commanding officers, Plaintiff's limited mobility in his hands impedes his ability to type. *See*, *e.g.,* Ex. 5, section III(A)(1)(D) (July 2020 Commander Statement). This limitation is particularly problematic because the ability to reliably type patient medical notes affects efficient patient care as well as continuity of care because other providers rely on accurate and timely notes to treat patients. All of this may further impose unreasonable requirements on the Army—which renders Plaintiff unfit under the third independent general criterion of DoDI 1332.18.

**D.  The Intervention by the Physical Disability Agency and Its Solicitation of, and Reliance on, the Opinion of the OTSG Psychiatry Consultant Was Improper**

52. The PDA's intervention and its overturn of the PEB's initial (and accepted) findings was arbitrary, capricious, and contrary to law for at least five reasons.

53. *First,* as prefaced above, there are no special rules for determining fitness for physicians such that the PDA's ex-parte communication with the OTSG consultant was relevant or merited. Plaintiff's fitness and disposition must be evaluated under the same standards and regulations as other service members of his rank or rating, and the Army must consider the responsibilities and duties of a soldier of his rank or rating as well as the duties of all service

members regardless of rank or rating.  *See, e.g., Nyan v. United States,* 154 Fed. Cl. 463, 465-66 (Fed. Cl. 2021) (finding that a service member's ability to perform limited administrative tasks below his grade and rank was insufficient to support a finding of fitness, especially where the three independent factors for determining "tipped in favor of finding [the service member] unfit").  The OTSG Opine that Plaintiff could "serve *as a psychiatrist*" is therefore not dispositive to his fitness or unfitness for duty.  Ex. 9 at 1 (OTSG Opine Email).

54.     *Second,* despite the PEB having found Plaintiff unfit under the applicable standards in May and July 2021, the PDA's rebuttal deeming Plaintiff fit was arbitrary and capricious because it failed to cite or engage with any regulations or standards to support its new conclusion. Accordingly, the PDA's reversal of the PEB's finding directly disregards the initial decision's bases in law and fact and conflicts with Plaintiff's three commanders' assessments that considered Plaintiff's medical records, physical limitations, and his MOS as an Army Psychiatrist (60W). Their conclusion: Plaintiff's medical conditions prevent him from serving as a 60W.  Their recommendation, consistent with the medical evidence: Plaintiff should be found unfit and medically separated.  Neither the PDA nor the formal PEB provided a reason for their blatant disregard of these official statements—which are certainly more relevant and informed than the OTSG Opine.

55.     *Third,* the intervention of the PDA improperly relied on the opinion of a psychiatry consultant who not only failed to consider the applicable standards of fitness, but also had a suspected conflict acknowledged by the OTSG.[13]  Moreover, there is no evidence that this consultant even reviewed Plaintiff's medical record.

_____

[13] The psychiatry consultant who reviewed Plaintiff's case was noted to "have a conflict with reviewing this case," because the consultant "worked with [Plaintiff] in the past."  Ex. 9 at 2 (OTSG Opine).

56.     *Fourth,* the PDA's review of Plaintiff's file upon intervention in August 2021 exceeded the scope and purpose permitted by Army Regulation.  The scope of PDA review permitted by AR 635-40, 4–25(c) is "confined to the case records, medical file or documentation, and related evidence received from the PEB."  As discussed above, AR 635-40, section 4–25(c) outlines five purposes of PDA review, all of which ensure that the interests of the service member were met and that the PEB and MEB proceedings were consistent with applicable law and regulations.  *Id.*  Based on the limited correspondence between the PDA and OTSG, there is no evidence that suggests the PDA's review was premised on, or even addressed, any of those permitted purposes.  For example, neither the PDA nor the OTSG (1) considered whether a hearing was full and fair (in fact, both impeded a full and fair FPEB hearing); (2) considered or cited military regulations or additional evidence that would support a reversal under the same standards; (3) assessed equitable findings or relevant facts; (4) determined whether due consideration was given to the facts and requests contained in recommendations submitted by or for Plaintiff (in fact, the PDA introduced outside non-medical facts to its own rebuttal), or even engaged with  Plaintiff's commanding officer evaluations that stated that Plaintiff's disabilities precluded him for safely performing his duties as an Army psychiatrist; or (5) considered whether records of the case were accurate or complete.

57.     *Fifth*, the decision of the PEB to reverse Plaintiff's fitness decision violated Army Regulation 635-40, section 4–25(e), which allows the PDA to independently make administrative changes or corrections when the administrative change *does not* change a finding of unfit to fit for any condition adjudicated.  Where a change in characterization of fitness may be warranted, the PDA can return the case to the PEB for reconsideration, clarification, and further investigation, or it can issue revised findings.  This limitation of the PDA's power presumably serves, in part, to

protect a service member's right to a full and fair hearing under 10 U.S.C. §1214.  Here, the PDA's review *did* change the finding of unfit to fit for Plaintiff's conditions.

## COUNT I

### VIOLATION OF ADMINISTRATION PROCEDURE ACT

58.     Plaintiff re-alleges and incorporates by reference each of the forgoing paragraphs as if set forth herein.

59.     Plaintiff has exhausted his administrative remedies within the Army.  The PDA's decision to uphold the PEB's final fit finding is subject to judicial review as a final "agency action" under the APA.  *See* 5 U.S.C. §§ 551(13), 701, 704.

60.     Under section 706(2)(A) of the APA, this Court is required to hold unlawful and set aside a final agency action that is arbitrary, capricious, unsupported by substantial evidence, or otherwise not in accordance with law.

61.     The Army's final decision to find Plaintiff fit for duty was arbitrary, capricious, unsupported by substantial evidence, and otherwise not in accordance with law.  The Army failed to follow the requisite criteria set forth in 10 U.S.C. § 1201 and  DoDI 1332.18 that direct the Army's findings of fitness to turn on whether Plaintiff's neck and spine injuries rendered him unfit based on his "office, grade, rank, or rating."  Instead, the PDA, the OTSG consultant, and the formal PEB assessed Plaintiff on whether he was able to perform a subset of his required duties and whether he had ability to serve in the military in any setting or capacity.  Accordingly, the Army's ultimate fit finding was arbitrary, capricious and contrary to law.  It was made independently by the PDA, against applicable regulations, and was based on an ill-begotten and unsupported OTSG opinion.

62.     As a direct result of the unlawful actions of the PDA, Plaintiff has been, and continues to be, deprived of the disability retirement, pay, and benefits to which he is entitled.

## **PRAYER FOR RELIEF**

Plaintiff John C. Coleman prays that this Court enter Judgment against the Defendant and grant the following relief:

a.  Find that the PDA's reversal, subsequent PEB determination, and PDA's affirmance were arbitrary and capricious, unsupported by evidence, and contrary to law;

b.  Declare, under the Declaratory Judgment Act, that the PDA has violated the Administrative Procedure Act;

c.  Award Plaintiff costs and attorneys' fees; and,

d.  Grant any other relief the Court deems proper.

Dated: March 15, 2022                            Respectfully submitted,

                                                  /s/   *Bert C. Reiser*

                                                 Bert C. Reiser (DC Bar No. 451942 )
                                                 Genevieve P. Hoffman (DC Bar No. 155092)
                                                 LATHAM & WATKINS, LLP
                                                 555 Eleventh Street, NW, Suite 1000
                                                 Washington, D.C. 20004-1304
                                                 T: (202) 637-2200
                                                 bert.reiser@lw.com
                                                 genevieve.hoffman@lw.com

                                                 Miriam G. Cabello (*pro hac vice pending*)
                                                 LATHAM & WATKINS, LLP
                                                 140 Scott Drive
                                                 Menlo Park, California 94025
                                                 T: (650) 328-4600
                                                 mia.cabello@lw.com

                                                 Esther Leibfarth (DC Bar No. 1016515)
                                                 Rochelle Bobroff (DC Bar No. 420892)
                                                 National Veterans Legal Services Program
                                                 1600 K Street, NW, Suite 500
                                                 Washington, DC 20006-2833
                                                 T: (202) 265-8305, ext. 130

esther@nvlsp.org
rochelle@nvlsp.org

*Counsel for Plaintiff John C. Coleman*